

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-10-00166-CV

WELLS FARGO BANK, N.A.                                                          APPELLANT

V.

PEGGY BLACKBURN                                                          APPELLEE

----------

### FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Wells Fargo Bank, N.A. raises three issues challenging the trial court's judgment that it take nothing on its claims against Appellee Peggy Blackburn for breach of contract and account stated. Wells Fargo claims that Peggy is liable for the charges incurred on a Wells Fargo Visa credit card; Peggy argues, and the trial court found, that she was merely an authorized user of the

---

[1]*See* Tex. R. App. P. 47.4.

credit card and was not personally liable for the debt on the credit card. For the reasons set forth below, we will affirm the trial court's judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Peggy was married to Gilden Blackburn ("Gil") in 2002. In 2002, Gil obtained Wells Fargo Visa credit cards with an account number ending in 9904; Gil was the accountholder, and Peggy was simply an authorized user of the credit card.[2]

After the Wells Fargo Visa credit card account had been opened, Peggy inquired about getting rewards points for airline tickets. Wells Fargo told Peggy that all she had to do to was complete an extra benefits form. According to Peggy, a private banker at Wells Fargo completed the portion of the form pertaining to Peggy's information, and Peggy signed the form at the bank. Peggy did not recall anything being on the form except her signature; the box beside "Add a Joint Accountholder" was not checked. When the private banker went to her computer to activate the benefits, she told Peggy that she was not authorized to apply for benefits because Gil was the accountholder. The private banker told Peggy to take the form home and have Gil sign it. After Gil signed it, he "took it from there."

---

[2]There were two authorized users on the account: Peggy and her daughter. A record keeper with Wells Fargo testified that an "authorized user" is not personally liable for the debt, and an account with an authorized user typically involves a parent/student situation. He further testified that authorized users' names are not on the account, and authorized users do not get the information reported on their credit reports.

2

Gil and Peggy used their Wells Fargo Visa credit cards up until 2006. Peggy filed for divorce in January 2006. Gil subsequently called Wells Fargo to cancel the Visa credit card because he did not want to be held responsible for charges on that account. The last time that Gil used the Visa account ending in 9904 was prior to March 10, 2006.

In March 2006 after Peggy had filed for divorce, she went to buy gas one day, and her Wells Fargo Visa credit card was declined; Peggy discovered that the credit card account had been frozen. The following week, she received a letter from Wells Fargo stating that Gil had closed the account and had told them that Peggy would assume responsibility for the outstanding balance. Peggy tried to get the account ending in 9904 reinstated in March 2006 after Gil had closed it, but Wells Fargo told her that she was not authorized to make changes to the account because she was only an authorized user on the account, not the accountholder. Peggy then asked her divorce lawyer to send Gil a letter requesting that he reactivate the account. Gil thereafter told her that he had reactivated the account,[3] and she received a credit card with an account number ending in 3155.[4] Peggy testified that Wells Fargo never asked for any financial information from her in connection with the issuance of the replacement credit card and that she never supplied any financial information to Wells Fargo.

---

[3]Gil testified that in response to the letter, he did not reinstate the Visa account.

[4]Peggy testified that Gil knew about the 3155 card and told her to cut it up.

3

Gil testified that he did not learn that Wells Fargo had issued Peggy a Visa card ending in 3155 until April 2007 when he received a letter from Wells Fargo demanding $60,000. Gil claimed that he immediately contacted Wells Fargo and explained that he had not made any of the charges and had never used that account.

According to Peggy, right before Gil apparently closed the 9904 account, she had received a bill on the 9904 account and had contacted Gil to see which charges were his; when some charges on the card apparently were not made by either Gil or her, she called Wells Fargo to report unauthorized charges on the account. Wells Fargo told her that their policy was to report the card as lost or stolen, to freeze that account, to open a new account with a new number, and then to credit the account for the items that were not charged by the users. Wells Fargo then issued the card on the 3155 account. Peggy used the new account and testified that she incurred all of the charges on the 3155 account—$61,000—"to meet the needs of [her] kids," including paying for her daughter's wedding.

In November 2007, Peggy wrote a letter to Wells Fargo that used the term "joint credit card." Peggy testified that when she used the term "joint credit card" in her letter to the bank, she did not know that the term had a legal meaning; she simply meant that she considered it her joint responsibility to provide for her children. She stated that the responsibility for the debt "is obviously in both our names."

4

Peggy spoke with Mary at Wells Fargo in December 2007. Mary spoke with her supervisors before asking for Gil's address. After Peggy gave Gil's address to Mary, Peggy did not receive anything else from Wells Fargo.

Peggy testified that she did not ask to become a joint accountholder and that there was never any discussion about her becoming a joint accountholder. Wells Fargo told her that she was a joint accountholder only after she had incurred the charges on the 3155 account. However, Peggy testified that there was also a time after those charges were incurred when Wells Fargo told her that she was not liable on the debt.

Leo Holloway, a paralegal and record keeper at Wells Fargo, testified that he was familiar with the statements related to the account ending in 9904 and the account ending in 3155. Holloway testified that when the account ending in 9904 was opened in March 2002, Peggy was not personally liable because the account was set up as an authorized user account with Peggy as an authorized user; on the initial form to open the account, "additional cardholder" was circled, rather than joint accountholder, and Gil did not apply for the rewards points program. The credit card agreement disclosures were sent to Gil when the account was opened.

Holloway testified that Peggy became a joint accountholder on December 3, 2003, and became "primary liable" at that point. Holloway said that he relied on the "Add a Joint Accountholder" part of the "Extra Benefits Request Form" to reach that conclusion, but he admitted that he did not know who had put a check

5

mark in the box next to add a joint accountholder. Holloway was positive that no one at Wells Fargo would have completed that form. He assumed that Gil or Peggy had completed the form, but he had no personal knowledge of whether the form was filled out before Peggy signed it. Wells Fargo never asked Peggy to submit financial information to justify the extension of credit to her, but Holloway said that such information is not required if the person becomes a joint accountholder.

Wells Fargo received a call from Gil on or about March 10, 2006, stating that he was going through a divorce and requesting that the account ending in 9904 be closed. Wells Fargo could not close it because there was a second cardholder.[5] So Wells Fargo froze the account.

Shortly thereafter, Peggy called and reported the credit card as lost or stolen, and the account was "reopened" with an account number ending in 3155 and was listed under Gil's and Peggy's names. After the account ending in 9904 was reported as lost or stolen, it was closed on April 4, 2006. The balance of $5,568.23 was then transferred to the account ending in 3155.

Holloway testified that at one point, Peggy returned a call from Wells Fargo and was "very upset" because Gil had not agreed to pay the total amount due. Peggy felt that she should not have to pay the total amount due. The problem

---

[5]Holloway testified that Wells Fargo's computer records indicate that Peggy's role changed in March 2006, but it does not indicate a change from a signer to an accountholder.

6

was referred to Kim, who is a supervisor, to "make sure that there is a secondary cardholder." Holloway thereafter examined notes from Wells Fargo's system dated July 16, 2007, which showed that the account was transferred "to Kim so we can find out how she [Peggy] became secondary accountholder instead of authorized or just a signer, which was her role on account before. NL1 closed in 3-06." Holloway explained that a "secondary accountholder" is a "joint cardholder" and that a joint cardholder has joint and several liability.

In December 2007, Wells Fargo quit sending statements to Peggy and started sending them to Gil because the skip tracing department found a new address for Gil in Weatherford and sent the December 20, 2007 statement to that address.[6] The notes from Wells Fargo's computer records dated December 21, 2007, show that the account was "under primary and authorized user." Holloway did not interpret this note to mean that Wells Fargo had determined that Peggy was just an authorized user. Holloway said that it would not be correct to say that Mary told Peggy that Wells Fargo had reviewed the account and had determined that Peggy was only an authorized user and had no personal liability, so from December on they were going to send the statements to Gil. On December 26, 2007, the notes indicate that there was no authorized user and

_____

[6]Gil testified that he now lives in Weatherford but that he previously lived in Lipan, Texas, with Peggy from July 2005 until November 2005 when he moved out.

7

that Wells Fargo quit talking to cardholder one and cardholder two[7] and found that both were responsible for the debt.

Holloway did not bring copies of checks to show who had made payments on the account. As of the trial, the balance due on the account ending in 3155 exceeded $61,000.[8] Holloway testified that Wells Fargo did not receive a dispute of charges from Peggy.

### III. FINDINGS OF FACT AND CONCLUSION OF LAW

After hearing the evidence above, the trial court made the following findings of fact:

1. On or about March 13, 2002, Gilden B. Blackburn ("Gil Blackburn") applied (the "application") for a Wells Fargo Bank, N.A. ("Wells Fargo") credit card;

2. The application was written and entitled "Private Client Services Visa Platinum Application";

3. The original Wells Fargo account number was [XXXXXXXXXXXX]9904;

4. On or around April, 2006, the original account was changed to account number [XXXXXXXXXXXX]3155;

---

[7]Holloway explained that when the notes from the computer records say that a Wells Fargo representative spoke with a cardholder, that is not an authorized user. This contradicts his conclusion that Peggy was originally an authorized user on the account because "additional cardholder" was circled on the initial application for the credit card.

[8]The statement from January 4, 2008 shows a balance of $61,177.50. Holloway said that the trial court would have to refer to statements for a finance charge rate because there are no supplemental disclosures other than those noted on the statements of a fixed rate account.

5. Wells Fargo was attempting to collect indebtedness incurred under both account numbers;

6. Peggy Blackburn was the spouse of Gil Blackburn at the time of all credit applications;

7. Wells Fargo admitted that Peggy Blackburn was not personally liable for charges on the account;

8. On or about December 3, 2003, Peggy Blackburn signed a Wells Fargo "Extra Benefits Request Form" (the "form") for the sole purpose of accessing the "extra benefits," including reward points, etc., available by use of the account[;]

9. Peggy Blackburn signed the form in blank without any handwriting contained thereon;

10. Peggy Blackburn did not manifest an intent to be personally liable on the account;

11. A Wells Fargo representative completed the form, including identifying Peggy Blackburn as a joint account holder, after the form was executed by Peggy Blackburn;

12. Neither Peggy Blackburn nor Gil Blackburn could identify whose printed handwriting was contained on the form;

13. Wells Fargo's computer records in July and December 2007 indicated that Peggy Blackburn was an "authorized user" of the account;

14. In 2007, Wells Fargo supervisors reviewed the account to determine whether Peggy Blackburn was personally liable for any charges;

15. It was determined by Wells Fargo that Peggy Blackburn was not personally liable for charges on the account;

16. Starting in 2007 Wells Fargo sent all monthly account statements and demands for payment to Gil Blackburn and not Peggy Blackburn;

9

17. The Wells Fargo "Customer Agreement and Disclosure Statement" was stamp dated April 14, 2008;

18. An interest rate for account balances was not shown;

19. Wells Fargo never attempted to secure credit information from Peggy Blackburn;

20. Peggy Blackburn never requested an extension of credit to her from Wells Fargo;

21. The form was used for multiple purposes—not only for adding a joint account holder—but also for accessing the "Rewards Benefit" program;

22. Gil Blackburn and Peggy Blackburn made charges to the account; and,

23. Gil Blackburn paid monies to Wells Fargo on the account.

Among the conclusions of law, the trial court concluded that "Wells Fargo and Peggy Blackburn did not have a contract covering the above-stated account numbers."

## IV. EVIDENCE SUPPORTS TRIAL COURT'S FINDING THAT PEGGY IS NOT PERSONALLY LIABLE ON ACCOUNT

In its first issue, Wells Fargo argues that Peggy is personally liable on the account. Wells Fargo specifically challenges findings of fact 7, 10, 13, 15, and 18.[9]

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven*

---

[9]Wells Fargo states in its brief, "The vast majority of the Court's Findings of Fact are not supported by the evidence. Rather than outline each Finding of Fact individually, the most erroneous are discussed below."

*Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 129 S. Ct. 501 (2008).

We may sustain a legal sufficiency challenge[10] only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and*

---

[10]Wells Fargo does not set forth any standard of review in its brief. Wells Fargo, moreover, does not specify whether it is challenging the legal or factual sufficiency of the trial court's findings; it states only that "[t]he vast majority of the Court's Findings of Fact are not supported by the evidence." We will review the trial court's findings of fact for legal sufficiency.

*"Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

In the record before us, the evidence conclusively establishes that Peggy was an authorized user under the original account application, in which "additional cardholder" is circled and in which "joint accountholder" is not circled. The key document in dispute is the extra benefits form. Peggy was the only person involved with the extra benefits form who recalled its execution; Holloway was not present when the form was signed, and Gil did not recall signing the form. The trial court thus had before it only Peggy's testimony as to her reasons for signing the form and who completed which portions of the form.

Peggy testified that she signed the form to obtain airline miles from the use of the credit card. Peggy went to Wells Fargo where a private banker completed the portion of the extra benefits form with Peggy's information—the box beside "Add a Joint Accountholder" was not checked—and then had Peggy sign it. After reviewing the account information on her computer screen, the private banker then told Peggy that she could not apply for the rewards benefits because Gil was the accountholder. The private banker never discussed having Peggy become a joint accountholder and never requested financial information from Peggy. The private banker told Peggy to take the form home and to have Gil sign it. The record includes a copy of the form and the mailer with the bank's return address on it; the form appears to have been mailed back to the bank and is stamped:

RECEIVED
DEC 02 2003
PO BOX 10347

Thus, more than a scintilla of evidence exists in the record that Peggy did agree to be personally liable on the account and that Peggy did not check the box to become a joint accountholder. Evidence also exists—by virtue of Wells Fargo's rejection of the extra benefits form when it contained only Peggy's signature and by its requirement that the cardholder (Gil) complete the extra benefits form and mail it back—that Peggy was not a joint accountholder but only an authorized user without the ability to make changes to the account. Moreover, Wells Fargo's own records indicated that Peggy was only an

13

authorized user on the account as of December 2007, and Peggy testified that Wells Fargo had told her that she was not personally liable on the account. The customer agreement[11] that was on file with Wells Fargo and that was admitted into evidence states, with regard to an additional cardholder, "If another person has use of your account and you want to end the person's privilege, you must recover and return that person's credit card, if any." The record contains no evidence that Gil ever recovered and returned Peggy's credit card for the account ending in 9904 or the account ending in 3155.

Considering the evidence favorable to the trial court's findings of fact that a reasonable factfinder could and disregarding evidence to the finding unless a reasonable factfinder could not, we hold that more than a scintilla of evidence exists supporting the trial court's findings of fact number 7, 10, 13, and 15. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *Best Bumper Supply, Inc. v. Coterill*, No. 08-02-00021-CV, 2004 WL 2067598, at *2, 7 (Tex. App.—El Paso Sept. 15, 2004, no pet.) (mem. op.) (holding that ample evidence supported the findings of fact and conclusions of law challenged by appellant because the record revealed that there was no credible evidence that wife acted improperly with regard to her use of the American Express account on which she was an authorized user). Because the

---

[11]The customer agreement was dated April 14, 2008. Holloway testified that he did not make an effort to find the agreement that might have existed in 2002 when Gil opened the account.

14

evidence supports these findings, we need not address Wells Fargo's challenge to finding of fact number 18 regarding the interest rate. *See* Tex. R. App. P. 47.1 (requiring court of appeals to address only issues necessary to final disposition of appeal).

In its reply brief, Wells Fargo argues that under *Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197, 204 (Tex. App.—Houston [1st Dist.] 2007, no pet.), Peggy's use of the Visa credit card created a contract. *Winchek*, however, dealt with the credit card company's failure to deliver a copy of the signed cardholder agreement to the cardholder, not the scenario we have before us in which an authorized user never signed paperwork to become a cardholder who would be liable on the account. Peggy's acknowledgement that she used the account ending in 3155 does not, unlike the reply brief contends, constitute an indication of liability; her use of the account was as an authorized user who was not liable. Simply put, the evidence supports the trial court's conclusion that Wells Fargo and Peggy Blackburn did not have a contract covering her accounts ending in 9904 or 3155; Wells Fargo failed to obtain the necessary paperwork to hold Peggy liable on the accounts. We therefore overrule Wells Fargo's first issue.[12]

---

[12]We likewise overrule the first, second, third, and fifth issues raised in Wells Fargo's reply brief, which all deal with the findings of fact and conclusions of law.

15

## V. PEGGY WAS NOT REQUIRED TO PLEAD ANY VERIFIED DENIALS OR AFFIRMATIVE DEFENSES

In its second issue, Wells Fargo argues that Peggy was required to plead that she lacked the intent to become a joint accountholder as an affirmative defense.[13] Wells Fargo relies on Texas Rule of Civil Procedure 94 in making its argument. But intent is not specifically listed as an affirmative defense under that rule. *See* Tex. R. Civ. P. 94. An affirmative defense does not tend to rebut factual propositions asserted by a plaintiff, but rather it seeks to establish an independent reason why the plaintiff should not recover. *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex.), *cert. denied*, 502 U.S. 824 (1991).

Here, Peggy does not assert that she executed paperwork making her a joint accountholder but did not intend to; she asserts that she never completed any paperwork making her a joint accountholder. Thus, intent is not an affirmative defense here. *Gonzales v. Pan Am. Nat'l Bank*, 692 S.W.2d 111, 111 (Tex. App.—Dallas 1985, no writ) (stating that "[a]ffirmative defenses, as opposed to a defendant's denials, are the propositions which a defendant may

---

[13]Wells Fargo's second issue is set forth as "Peggy Blackburn waived the defense of alteration of the Form without her authority when she failed to plead it as an affirmative defense under Tex. R. Civ. P. 94." Wells Fargo, however, did not brief an argument related to the defense of alteration; instead, it briefed an argument regarding the defense of lack of intent. We hold that Wells Fargo therefore waived its argument regarding any such failure on Peggy's part to plead an affirmative defense for alteration of the form. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (citing the long-standing rule that a point may be waived due to inadequate briefing).

assert and interpose to defeat a prima facie case made by the plaintiff"). Wells Fargo nonetheless argues that lack of intent is analogous to failure of consideration, which is listed as an affirmative defense in rule 94, but Wells Fargo cites no case law to support this argument, and we have located none. We overrule Wells Fargo's second issue.

In its third issue, Wells Fargo argues that Peggy waived the defense that she was not liable for payment of the account by failing to plead that she was not liable in the capacity in which she was sued. Wells Fargo contends that because Peggy's defense was that she was not liable because she was not a joint accountholder, she should have pleaded the defense that she was not liable in that capacity. Wells Fargo, however, never specifically pleaded that Peggy was liable as a joint accountholder. Instead, Wells Fargo's original petition defines Peggy as an individual and Gil as individual and defines "BLACKBURN" as referring to both Peggy and Gil. All causes of action pleaded by Wells Fargo are asserted against "BLACKBURN," even though some of the actions referred to— e.g., that "BLACKBURN" was the basic cardholder on the Account—clearly refer to only one individual (in the previous example, Gil).

But, to the extent that Wells Fargo's pleading can be construed to contain a cause of action against Peggy for joint liability on the account, Peggy included in her first amended answer two verified denials: she denied execution by herself or by her authority of any instrument in writing upon which Wells Fargo's pleadings were founded, and she denied the account that is the foundation of

17

Wells Fargo's action. Because Peggy filed these denials, we cannot agree with Wells Fargo that, somehow, Peggy "waived the defense that she was not liable for payment of the account by failing to plead that she was not liable in the capacity in which she was sued." We overrule Wells Fargo's third issue. *See, e.g.*, Tex. R. Civ. P. 93(2); *Booher v. Criswell*, 531 S.W.2d 844, 844 (Tex. Civ. App.—Dallas 1975, no writ) (holding that appellant's verified denial was sufficient to put appellee on proof of his claim on the account sued upon); *White v. Jones*, No. 14-97-00035-CV, 1999 WL 250721, at *4 (Tex. App.—Houston [14th Dist.] Apr. 29, 1999, no pet.) (not designated for publication) (holding that verified answer that specifically denied each and every item in sworn account was sufficient to put plaintiffs to their proof).

## VI. ISSUE RAISED SOLELY IN REPLY BRIEF IS WAIVED

In its fourth issue in its reply brief, Wells Fargo argues that the trial court erred by refusing to admit the parties' mediated settlement agreement regarding their divorce. Because this issue was not raised in Wells Fargo's initial appellate brief, we hold that it is waived. *See Priddy v. Rawson*, 282 S.W.3d 588, 597 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (stating that the Texas Rules of Appellate Procedure do not allow an appellant to include in a reply brief a new issue not raised in the appellant's original brief); *see generally* Tex. R. App. P. 38.3. We overrule Wells Fargo's fourth reply issue.

18

## VII.  CONCLUSION

Having overruled all of Wells Fargo's issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED:  February 3, 2011